**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION**

| | |
|---|---|
| RHONDA JONES, BRITTANY DIXON, JAMIE LAWS, JASMINE LAWS-HORD, and VERONICA LEE, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| VIVIANT CARE MANAGEMENT LLC, GLEN OAKS HEALTHCARE LLC d/b/a VIVIANT HEALTHCARE OF SHELBYVILLE, POLLAK INNOVATIVE MANAGEMENT PARTNERS LLC, SAMUEL GOLDNER, and DOES 1 through 3, | ) ) ) ) ) ) ) |
| Defendants. | ) |

Case No.

JURY DEMAND

## COMPLAINT

For their Complaint against Defendants Viviant Care Management LLC, Glen Oaks Healthcare LLC d/b/a Viviant Healthcare of Shelbyville, Pollak Innovative Management Partners LLC, Samuel Goldner, and Does 1 through 3 (collectively, "Defendants"), Plaintiffs Rhonda Jones, Brittany Dixon, Jamie Laws, Jasmine Laws-Hord, and Veronica Lee ("Plaintiffs") state:

### I. PARTIES

1. Plaintiffs are former employees of Defendants in this District.

2. Defendant Viviant Care Management LLC ("Viviant Care Management") is a Tennessee limited liability company with its principal place of business at 525 Chestnut Street, Suite 102, Cedarhurst, NY 11516-2223, and doing business in this District under the name of Viviant Healthcare. Viviant Care Management may be served with process through its registered agent, C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

3. Defendant Glen Oaks Healthcare LLC d/b/a Viviant Healthcare of Shelbyville

1

("Glen Oaks") is a Tennessee limited liability company with its principal place of business at 525 Chestnut Street, Suite 102, Cedarhurst, NY 11516-2223. Glen Oaks may be served with process through its registered agent, C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

4. Defendant Pollak Innovative Management Partners LLC ("Pollak Innovative") is an Ohio limited liability company with its principal place of business at 1200 Babbitt Road, Euclid, OH 44132, and doing business in this District with Viviant Care Management and Glen Oaks. Pollak may be served with process through its registered agent, Yaakov Pollak, 1200 Babbitt Road, Euclid, OH 44132.

5. Defendant Samuel Goldner ("Mr. Goldner") is a citizen of New York and the owner of Viviant Care Management and Glen Oaks. According to the Tennessee Secretary of State, Viviant Care Management and Glen Oaks were administratively dissolved on August 8, 2023. However, the Glen Oaks nursing home facility discussed below continues its normal operations. Mr. Goldner is the only known successor in interest to both entities. Mr. Goldner may be served with process through his business's registered agent, C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

6. Defendants Does 1-3 are factiously named defendants whose true name and identity have not been ascertained, but who, upon information and belief, are in some way responsible for the harm alleged by Plaintiffs in this Complaint. These include, but are not limited to, any corporate members, subsidiaries, parents, affiliates, and successors in interest to Viviant Care Management, Glen Oaks, and Pollak Innovative. Once such defendants have been properly identified, Plaintiffs will add them to this action as party defendants.

7. Viviant Care Management owns and operates six skilled nursing facilities throughout Tennessee and South Carolina.

8. Glen Oaks is a wholly owned subsidiary or affiliated corporate entity of Viviant Care Management that operates a nursing home facility in Shelbyville, Tennessee, where Plaintiffs worked, on behalf of Viviant Care Management.

9. Pollak Innovative specializes in providing culinary, housekeeping, and linen services in the health care industry. On or about July 12, 2022, and upon information and belief, Pollak Innovative entered into an agency or contractual relationship with Viviant Care Management and Glen Oaks to provide various services at the Glen Oaks facility.

10. Defendants operate as a joint employer. Viviant Care Management drafts and controls all corporate policies and procedures, including employment-related policies, requires Glen Oaks and Pollak to implement such policies and procedures in the workplace, and has authority to remove or terminate employees from job assignments or otherwise affect the terms and conditions of their employment. Meanwhile, Glen Oaks and Pollak work together to select and pay the employees and provide the supervision, equipment, supplies, and materials necessary to perform the work.

11. Whenever it is alleged that "Defendants" did any act or failed to do any act, it is meant that the officers, employees, and/or agents of Defendants performed, participated in, or failed to perform or participate in such acts or things while in the course and scope of their employment or agency relationship with Defendants.

## II. JURISDICTION AND VENUE

12. This is an action for equitable relief and damages for unlawful employment practices brought under 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA"), Tennessee common law, and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA"). The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a). Venue is proper under 28 U.S.C. § 1391.

13. Plaintiffs timely filed Charges of Discrimination against Defendants Viviant Care Management and Glen Oaks with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Plaintiffs "Notice of Right to Sue" letters on August 4, 2023, true and correct copies of which are attached as **Exhibits A-E**.

### III. FACTS

14. Plaintiffs were all formerly employed by Defendants at the Glen Oaks nursing home facility located in Shelbyville, Tennessee.

15. Plaintiffs Rhonda Jones, Jamie Laws, Jasmine Laws-Hord, and Veronica Lee are African American individuals. Plaintiff Brittany Dixon is Caucasian.

16. Ms. Dixon is the daughter-in-law of Ms. Laws.

17. Plaintiffs worked at the Glen Oaks nursing home facility under Facility Administrator Heidi Shirley ("Ms. Shirley"), Supervisor Shauna Lewis-Taylor ("Ms. Lewis-Taylor"), and Human Resources Director Jennifer Ingram ("Ms. Ingram"), each of whom are Caucasian.

18. Plaintiffs were qualified for their jobs with Defendants and performed their jobs in a competent and satisfactory manner.

19. During Plaintiffs' employment, Defendants created, allowed, maintained, and failed to remedy a race-based hostile and abusive working environment that altered the conditions of Plaintiffs' employment and made it more difficult for them to perform their jobs.

20. Ms. Shirley continuously made race-based statements that were derogatory and contemptuous toward African American individuals, and all three members of upper management engaged in race-based discriminatory and retaliatory conduct toward Plaintiffs.

21. During their employment, Defendants discriminated against Plaintiffs Jones, Lee, Laws, and Laws-Hord in the terms, conditions, and privileges of employment because of their race and, and with respect to Plaintiff Brittany Dixon, because of her association with and advocacy on behalf of the other Plaintiffs.

22. Plaintiffs Jones, Lee, Laws, and Laws-Hord and other African American employees at Defendants' Shelbyville nursing home facility were subjected to discriminatory harassment, working conditions, and pay practices because of their race and, with respect to Plaintiff Dixon, because of her association with and advocacy on behalf of Plaintiffs. Each Plaintiff knew about the discrimination, harassment, and retaliation suffered by the other Plaintiffs and other Black employees.

23. For example, Plaintiffs Jones, Lee, Laws, and Laws-Hord were denied pay and referral bonuses, favorable work schedules, office space, demoted and denied promotions, and/or received unequal pay compared to similarly situated, non-African American employees.

24. Further, during Plaintiffs' employment, Facility Administrator Ms. Shirley openly and continuously used the words "nigger" and "nigga" in reference to Black employees and Black individuals in the workplace multiple times per week.

25. Ms. Shirley also called Black employees "ghetto" and frequently referred to Black employees collectively as "them people." She further had Black employees perform maintenance tasks, despite the facility's employment of a maintenance technician (who is Caucasian).

26. Ms. Shirley openly socialized with Caucasian employees but not with Black

employees. Rather, she scolded, nitpicked, and targeted only Black employees over extremely minor or petty issues.

27. After becoming fed up with Ms. Shirley's discriminatory conduct, Ms. Laws confronted Ms. Shirley about her racially offensive language and conduct.

28. In response, Ms. Shirley half-heartedly responded, "I don't do that, do I?"

29. Meanwhile, Ms. Ingram, who managed Defendants' human resources operations, talked down to Black employees, including referring to a new employee as a "little Black girl" and telling one Black employee that she would really notice a "*big* payment like that" (referring to a $150 bonus)., She further failed and refused to take any corrective or remedial action in response to her witnessing and learning of other employees' racially discriminatory and retaliatory statements and conduct.

30. Ms. Lewis-Taylor was present for and participated in the above-described racial discrimination and harassment, including repeatedly using the word "nigger" in the workplace.

31. Despite Ms. Jones' management position as a Registered Nurse Educator with 30 years of experience, Ms. Shirley placed her in an office with a picnic table instead of a desk. Ms. Shirley admitted that she did so that she could "keep an eye" on Ms. Jones.

32. In or about June 2022, Ms. Jones reported that, as the sole Black RN in management, she was being paid less than non-African American LPNs.

33. Upon being hired, Ms. Dixon was asked by Supervisor Lewis-Taylor what days Ms. Dixon wanted to work. Ms. Lewis-Taylor made it clear that Ms. Laws would be required to work the less desirable days, even though Ms. Laws had more seniority than Ms. Dixon. Ms. Dixon responded that she wanted to coordinate work schedules with Ms. Laws, her mother-in-law, for childcare purposes, but Ms. Lewis-Taylor replied, "I'm not worried about what she wants, I'm

worried about what you want." Ms. Dixon received more favorable treatment from Defendants than Ms. Laws because Ms. Dixon is Caucasian.

34. Plaintiffs were also denied sign-on or referral bonuses and other pay incentives while similarly situated, non-African American employees received such amounts. For instance, after the facility's washing machine malfunctioned, Ms. Lewis-Taylor promised several employees a $150 bonus payment if they completed laundry duties off premises at a local laundromat.

35. Although Ms. Dixon and Ms. Laws both performed the above-described offsite duties, only Ms. Dixon received the bonus. As justification, Ms. Shirley stated that the bonus was in her "discretion," which she plainly exercised in a racially discriminatory manner.

36. Similarly, unlike her non-African American counterparts, Ms. Lee was denied incentive pay for working beyond her regularly-scheduled shifts on several occasions.

37. On another occasion, when Ms. Lee mentioned to Ms. Ingram that she had arthritis in her shoulders, Ms. Ingram responded, "Well, maybe you need to think about taking disability then."

38. Plaintiffs opposed and complained about Defendants' racially discriminatory pay practices. For example, Ms. Laws complained about the disparate payment of bonuses to Viviant Care Management's then-CEO, David Craig, during a facility staff meeting in June 2022.

39. Another employee, Jasmine Baez, who is Latino American, repeatedly witnessed Plaintiffs and other Black employees being nitpicked and targeted because of their race, including Ms. Shirley chiding Black employees regarding their vaccination statuses and for forgetting to wear N95 face masks while saying nothing to non-African American employees about the same issues.

40. Ms. Baez complained to Ms. Ingram about the race discrimination she observed and asked, "Why does Heidi [Shirley] always pick on the Black employees?" Ms. Ingram responded, "You know how it is." Ms. Baez replied, "No, I don't understand, I'm not vaccinated either." Ms. Ingram refused to address Ms. Baez's complaint of race discrimination.

41. During another incident, Ms. Baez informed Ms. Shirley that her fiancé, who is Black, would be arriving to pick up her car keys. Ms. Baez left the keys at the front desk while she performed her duties elsewhere. Upon entering the facility, her fiancé approached Ms. Shirley at the front desk and informed her who he was and that he was picking up the car keys. Ms. Shirley stared at him and, without saying a word, turned around and walked away. Ms. Baez's fiancé had to call Ms. Baez to provide the keys to him.

42. Plaintiffs received no meaningful or appropriate responses to their complaints of race discrimination, harassment, retaliation, and unequal pay. Defendants failed and refused to take prompt and appropriate corrective action in response to those complaints. In fact, Defendants took no action to remedy the discrimination, harassment, and retaliation Plaintiffs experienced, opposed, and reported, or to prevent it from reoccurring. Rather, Defendants adopted the discriminatory conduct and allowed it to continue.

43. Plaintiffs reported their concerns of race discrimination and harassment to Defendants. Nevertheless, nothing was done to remedy their concerns of discrimination and harassment or to prevent it from continuing.

44. Rather, Defendants retaliated against Plaintiffs for opposing, reporting, and complaining about the race discrimination, harassment, and retaliation that they and other Black employees experienced.

45. In or about June 2022, Defendants discharged Ms. Lee for alleged poor

performance, mere days after she complained about her discriminatory pay concerns, and after Ms. Taylor-Lewis had complimented her job performance. Defendants discharged Ms. Lee because of her race and/or for opposing and reporting race discrimination and harassment.

46. In or about June 2022, Defendants had several patient safety incidents occur at their Shelbyville facility, including one suspicious death. Plaintiffs were instructed by Ms. Shirley not to cooperate with state officials in their investigation.

47. In fact, when a state surveyor visited Defendants' Shelbyville facility in late June 2022, Ms. Shirley instructed employee Tonya Anderson to watch who came out of the room where the state surveyor was located.

48. Ms. Jones, as an RN in management, refused to remain silent about or participate in illegal activity, disclosed what she believed to be violations of state law, and truthfully answered the state surveyor's questions of her regarding the same. When her interview with the surveyor finished, Ms. Jones observed Ms. Anderson standing very close to the wall of the adjacent room, where she had obviously been eavesdropped on Ms. Jones' interview with the surveyor.

49. Shortly thereafter, Defendants discharged Ms. Jones because of her race, her opposition to and reports of race discrimination, for reporting violations of state law and/or for refusing to remain silent about or participate in illegal activity. The same day, Ms. Baez heard Ms. Shirley state to Ms. Lewis-Taylor and Ms. Ingram, "You know how Black women are, they're loud and always need to have control!"

50. Ms. Jones then emailed then-CEO, Mr. Craig, stating in part, "I strongly believe [the termination] was retaliation for telling the state surveyor what I knew to be the truth on two incidents I was questioned on and racial discrimination. I have never thought that on any of my

jobs, but since I have been at Viviant, I have seen it and witnessed it from Heidi [Shirley]." Ms. Jones never heard back from Mr. Craig.

51. A few weeks later, in July 2022, Ms. Shirley discharged Ms. Laws-Hord and Ms. Laws, and lied about Ms. Laws breaking into the facility to "attack" Ms. Ingram.

52. In actuality, Ms. Lewis-Taylor instructed Ms. Laws to come to the facility to speak with Ms. Ingram about a payroll error.

53. Ms. Baez witnessed this interaction and heard Ms. Shirley state, "You know how Black women are, I was fearing for my safety," despite there being no actual safety risk.

54. After their terminations, Ms. Lewis-Taylor intentionally deleted Ms. Laws-Hord's and Ms. Laws' recorded work hours and time entries in violation of federal and state law, which delayed their final paychecks by at least two weeks. This was yet another retaliatory act.

55. Soon after terminating Ms. Laws-Hord and Ms. Laws, Defendants' management began targeting and retaliating against Ms. Dixon.

56. Ms. Shirley, Ms. Taylor-Lewis, and Ms. Ingram knew about Ms. Dixon's familial relation and association with Ms. Laws, her advocacy on her behalf, and her opposition to and refusal to remain silent about Defendants' management's illegal discriminatory conduct, including opposing discriminatory work schedules and pay practices.

57. In a conversation concerning Ms. Laws that occurred in Ms. Dixon's presence, Ms. Lewis-Taylor said to Ms. Shirley, "You know this [Ms. Dixon] is her daughter-in-law, right?" Ms. Lewis-Taylor and Ms. Shirley then walked to the smoking area away from Ms. Dixon.

58. After the other Plaintiffs' terminations, Ms. Dixon was harassed, targeted, and retaliated against, including being nitpicked while performing her job duties and then ignored when making work-related inquires, which adversely affected her ability to perform her job.

59. Ms. Ingram expressly told Ms. Baez that management wanted to "figure out a way to get rid of" Ms. Dixon because she was "snitching" to Ms. Laws about Defendants' management's ongoing discriminatory and retaliatory actions at the Glen Oaks facility.

60. Ms. Dixon complained about this discriminatory harassment and retaliation directly to Ms. Lewis-Taylor, stating that she believed she was being targeted and retaliated against due to her association with and advocacy on behalf of Ms. Laws.

61. Ultimately, Ms. Dixon could no longer tolerate the discrimination, harassment, retaliation, and Defendants' failure to take any corrective or preventative action following her complaints of associational discrimination and retaliation. She was constructively discharged due to intolerable working conditions and left her employment in August 2022.

## IV. CAUSES OF ACTION

### COUNT I: RACE DISCRIMINATION, RACIAL HARASSMENT, AND RETALIATION IN VIOLATION OF SECTION 1981, TITLE VII, AND THE THRA
(All Plaintiffs)

62. As described above, Defendants discriminated against Plaintiffs Jones, Laws, Laws-Hord, and Lee in the terms, conditions, and privileges of employment and subjected them to disparate treatment because of their race and, with respect to Plaintiff Dixon, because of her association with and advocacy on behalf of Ms. Laws and the other Plaintiffs, all in violation of Section 1981, Title VII, and the THRA.

63. As described above, Defendants subjected all Plaintiffs to a hostile and abusive work environment that altered the conditions of their employment because of their race and, with respect to Plaintiff Dixon, because of her association with and advocacy on behalf of the other Plaintiffs, all in violation of Section 1981, Title VII, and the THRA. Plaintiffs bring their hostile work environment claims on individual and aggregated bases.

64. As described above, Defendants retaliated against all Plaintiffs because of their opposition to and reports and complaints about race discrimination and harassment and, with respect to Plaintiff Dixon, because of her association with and advocacy on behalf of the other Plaintiffs, all in violation of Section 1981, Title VII, and the THRA.

65. As Viviant Care Management's and Glen Oaks' owner and/or successors in interest, Mr. Goldner and Does 1-3 had notice of Plaintiffs' claims prior to the dissolution of Viviant Care Management and Glen Oaks and therefore assume all claims, actions, debts, and liabilities thereof.

66. Defendants' conduct as described in this Complaint was malicious and/or recklessly indifferent to Plaintiffs' federally protected rights, entitling them to punitive damages under Section 1981 and Title VII.

67. As a direct result of Defendants' discriminatory and retaliatory conduct, Plaintiffs lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and have incurred attorneys' fees, costs and litigation expenses.

**COUNT II: RETALIATORY DISCHARGE FROM EMPLOYMENT IN VIOLATION OF TENNESSEE COMMON LAW AND/OR THE TPPA**
**(Plaintiff Jones Only)**

68. As described above, Defendants retaliated against and discharged Ms. Jones for exercising a right or duty established by statute or recognized by public policy, disclosing violations of state law, and/or refusing to violate state law, in violation of Tennessee common law, and/or solely because she refused to participate in and/or refused to remain silent about Defendants' illegal activities, including their actual or attempted obstruction of a state nursing home investigation, in violation of the TPPA.

69. As Viviant Care Management's and Glen Oaks' owner and/or successors in interest, Mr. Goldner and Does 1-3 had notice of Plaintiffs' claims prior to the dissolution of Viviant Care Management and Glen Oaks and therefore assume all claims, actions, debts, and liabilities thereof.

70. Defendants' conduct as described in this Complaint was willful, malicious, intentional, reckless and/or fraudulent, entitling Ms. Jones to punitive damages under the common law and/or the TPPA.

71. As a direct result of Defendants' retaliatory conduct, Ms. Jones lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and has incurred attorneys' fees, costs and litigation expenses.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request:

1. A jury trial;

2. Back pay and damages for lost benefits;

3. Compensatory damages for embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life;

4. Front pay and damages for lost benefits;

5. Punitive damages;

6. Attorneys' fees, costs and litigation expenses;

7. Prejudgment interest and, if applicable, post judgment interest; and

8. Such other and further legal or equitable relief to which they may be entitled.

Respectfully submitted,


s/Douglas B. Janney III
Douglas B. Janney III (BPR No. 19112)
Law Office of Douglas B. Janney III
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

s/Curt M. Masker
Curt M. Masker (BPR No. 37594)
Rickard Masker, PLC
810 Dominican Drive, Suite 314
Nashville, Tennessee 37228
(615) 270-2098
curt@maskerfirm.com

*Attorneys for Plaintiffs*