UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

RHONDA JONES, *et al.*,            )
                                   )
            Plaintiffs,            )
                                   )
v.                                 )       No.:   4:23-CV-34-TAV-MJD
                                   )
VIVIANT CARE MANAGEMENT, LLC,      )
*et al.*,                          )
                                   )
            Defendants.            )

## <u>**MEMORANDUM OPINION**</u>

This civil action is before the Court on plaintiffs' motions for default judgment against defendants Viviant Care Management LLC ("Viviant"), Glen Oaks Healthcare LLC ("Glen Oaks") (collectively, the "Viviant Entities"), and Pollak Innovative Management Partners LLC ("Pollak") [Docs. 90, 92, 93, 94]. For the reasons below, plaintiffs' motions for default judgment [Docs. 90, 92, 93, 94] will be **GRANTED**.

## I.     Background

The Court takes as true the factual allegations in the complaint. *Bogard v. Nat'l Credit Consultants*, No. 1:12-CV-2509, 2013 WL 2209154, at *3 (N.D. Ohio May 20, 2013). Viviant owns and operates six skilled nursing facilities in Tennessee and South Carolina [Doc. 16 ¶ 7]. Glen Oaks is a wholly owned subsidiary or affiliated corporate entity of Viviant that operates a nursing home facility in Shelbyville, Tennessee (the "Facility") [*Id.* ¶ 8]. Pollak specializes in providing culinary, housekeeping, and linen services to healthcare facilities [*Id.* ¶ 9]. On or around July 12, 2022, Pollak contracted

with the Viviant Entities to provide onsite laundry, housekeeping, and dietary services at the Facility [*Id.* ¶ 21].

Plaintiffs worked at the Facility from March 2022 through July and August 2022 [*Id.* ¶¶ 25–32, 61, 67, 75–76, 81, 87]. The Viviant Entities hired plaintiffs Jasmine Laws-Hord, Veronica Lee, and Brittany Dixon as housekeepers, plaintiff Jamie Laws as a laundry attendant, and plaintiff Jones as a clinical nurse educator [*Id.*]. Plaintiffs are all African American except for Dixon, who is white [*Id.* ¶ 26]. Dixon is also the daughter-in-law of Laws [*Id.* ¶ 27]. Plaintiffs initially worked under the Viviant Entities' management personnel, including Facility Administrator Heidi Shirley, Human Resources Director Jennifer Ingram, and Laundry and Housekeeping Supervisor Shauna Lewis-Taylor [*Id.* ¶ 33]. Plaintiffs allege that Shirley, Ingram, and Lewis-Taylor engaged in race-based discriminatory and retaliatory conduct toward plaintiffs, resulting in their discharge or constructive termination [*Id.* ¶¶ 36–37, 40–42, 46, 68].

After Pollak and the Viviant Entities entered a contractual relationship, all laundry, housekeeping, and dietary department employees were required to submit new-hire applications to Pollak [*Id.* ¶¶ 21–24]. Pollak then offered Dixon, Laws, and Laws-Hord employment in their original positions, at the same or reduced hourly payrates, which Dixon, Laws, and Laws-Hord accepted [*Id.* ¶¶ 21, 73]. Pollak reduced Laws-Hord's pay by $2 per hour [*Id.* ¶ 23]. Thereafter, Pollak established new payroll practices, payrates, benefits, identification badges, and an electronic time clock procedure [*Id.*]. Dixon, Laws,

2

and Laws-Hord used equipment and supplies that belonged to both the Viviant Entities and Pollak to perform their work [*Id.*].

Lewis-Taylor, who supervised Dixon, Laws, and Laws-Hord, also became an employee or joint employee of Pollak on or about July 12, 2022 [*Id.* ¶¶ 21, 33, 73]. Plaintiffs allege that Lewis-Taylor participated in racial discrimination and harassment against them while she was employed by the Viviant Entities and Pollak [*Id.* ¶ 46]. Further, upon being hired by Pollak, Lewis-Taylor told Dixon, Laws, and Laws-Hord that Pollak would honor the sign-on, referral, and/or work bonuses that the Viviant Entities promised them [*Id.* ¶ 74]. Plaintiffs never fully received these bonuses [*Id.*].

Meanwhile, the Viviant Entities continued to supervise and oversee operations at the Facility and required Pollak to implement or adopt certain policies and procedures [*Id.* ¶ 22]. The Viviant Entities provided training materials to plaintiffs, and created plaintiffs' job descriptions, work schedules, and duties [*Id.*]. Plaintiffs allege that the Viviant Entities and Pollak jointly exercised control over their work, and Shirley and Ingram "continued to exert managerial control over [them], including the authority to make hiring, firing, and compensation decisions" [*Id.* ¶ 23]. As for Dixon, Laws, and Laws-Hord, plaintiffs allege that the Viviant Entities and Pollak shared the ability to (1) hire and fire them; (2) affect their compensation, terms, conditions, privileges, and benefits of employment; and (3) direct and supervise their job performance [*Id.* ¶ 24].

The amended complaint also details the nature of defendants' allegedly discriminatory and retaliatory conduct [*Id.* ¶¶ 36–37, 40–42, 46, 68]. For instance,

3

plaintiffs allege that Shirley continuously made derogatory, race-based comments in the workplace and used the words "nigger" and "nigga" in reference to African American employees [*Id.* ¶¶ 36, 40]. Shirley called the African American employees "ghetto" and often referred to them collectively as "them people" [*Id.* ¶ 41]. Moreover, Shirley openly socialized with white employees and not with African American employees, who she routinely targeted and scolded over minor issues [*Id.* ¶ 42]. The amended complaint also alleges that Lewis-Taylor participated in the racial discrimination and harassment and frequently used the word "nigger" in the workplace [*Id.* ¶ 46]. Ingram referred to a new employee as a "little Black girl," made racist comments, and did not take any corrective action in response to other employees' racially discriminatory and retaliatory statements and conduct [*Id.* ¶ 45].

Additionally, Jones, Lee, Laws, and Laws-Hord were denied bonuses, promotions, favorable work schedules, office space, and/or received unequal pay compared to similarly situated, non-African American employees [*Id.* ¶¶ 39, 50–51]. For instance, Jones, a registered nurse with 30 years of experience, was given an office with a picnic table instead of a desk and paid less than non-African American nurse practitioners [*Id.* ¶¶ 47–48]. Additionally, Lewis-Taylor gave Dixon more favorable scheduling than Laws who had more seniority [*Id.* ¶ 49].

As to employment benefits, Lewis-Taylor promised a bonus payment of $150 if employees completed offsite laundry duties after the Facility's washing machines malfunctioned [*Id.* ¶¶ 50–51]. Although both Dixon and Laws performed the same tasks

as instructed, only Dixon received the bonus [*Id.* ¶ 51]. As a result, plaintiffs allege that defendants "created, allowed, maintained, and failed to remedy a race-based hostile and abusive working environment that altered the conditions of [p]laintiffs' employment and made it more difficult for them to perform their jobs" [*Id.* ¶ 35].

Plaintiffs eventually reported their concerns of racial discrimination and harassment to defendants [*Id.* ¶ 59]. Plaintiffs allege that defendants did not remedy the discrimination or harassment, allowed it to persist, and retaliated against them [*Id.* ¶¶ 58–60]. In addition, plaintiffs allege that another employee, Jasmine Baez, repeatedly witnessed the discrimination against them and complained to Ingram who did not address the problem [*Id.* ¶¶ 55–56]. Shirley, Lewis-Taylor, and Ingram subsequently "made, influenced, and/or were involved in" defendants' decision to terminate plaintiffs' employment [*Id.* ¶ 80].

In or about early June 2022, defendants terminated Lee for poor performance days after she complained about discriminatory pay [*Id.* ¶ 61]. Thereafter, the Facility underwent an investigation by state officials related to the death of a resident [*Id.* ¶ 62]. Shirley instructed plaintiffs to lie to state officials about facts related to the resident's death, missing narcotics, and the reason why safety mats were not used [*Id.*]. Jones and Laws-Hord refused to remain silent about or participate in illegal activity and disclosed state law violations [*Id.* ¶ 64]. Around that time, Laws submitted a written complaint about Lewis-Taylor and Shirley to Ingram for racially discriminatory pay practices and other issues [*Id.* ¶ 66]. A few days later, on or about June 28, 2022, defendants terminated Jones after she raised discriminatory pay concerns and refused to lie to state investigators about

5

violations at the facility [*Id.* ¶¶ 48, 62–67]. Defendants also terminated Laws-Hord on or about July 20, 2022, after she submitted written complaints about and refused to obstruct the investigation of the facility [*Id.* ¶¶ 66, 75]. Soon thereafter, defendants terminated Laws after she submitted a written complaint about discriminatory pay and other issues [*Id.* ¶¶ 66, 76].

Similarly, Dixon complained to Lewis-Taylor that she believed she was being targeted and retaliated against because of her association with and advocacy on behalf of Laws [*Id.* ¶ 86]. Dixon was constructively discharged on August 12, 2022, because defendants harassed, targeted, and retaliated against her due to her association with and advocacy on behalf of Laws and others [*Id.* ¶¶ 84, 87].

On August 30, 2023, plaintiffs filed this action [Doc. 1]. Plaintiffs filed an amended complaint on October 26, 2023, alleging racial discrimination, harassment, and retaliation under 42 U.S.C. § 1981, the Tennessee Human Rights Act ("THRA"), and Title VII of the Civil Rights Act of 1964 ("Title VII") (Count 1) [Doc. 16 ¶¶ 88–103]. Jones and Laws-Hord also assert a retaliatory discharge claim in violation of the Tennessee common law and/or the Tennessee Public Protection Act ("TPPA") (Count 2) [*Id.* ¶¶ 104–11]. Lastly, plaintiffs allege piercing the corporate veil of the Viviant Entities (Count 3) [*Id.* ¶¶ 112–20].[1]

---

[1] Plaintiffs do not seek default judgment as to Count 3 and request that the Court dismiss this count without prejudice [Doc. 90, pp. 7, 25].

Defendants were served with summons [*See* Docs. 47, 48, 49]. The Viviant Entities never answered or defended against either complaint. The Clerk of Court entered default against the Viviant Entities on October 2, 2024 [Docs. 60, 61] because they failed to plead or otherwise defend in the action. Thereafter, Pollak's counsel filed a motion to withdraw [Doc. 65]. On March 5, 2025, the Court entered an order granting counsel for Pollak's motion and directing Pollak to have substitute counsel file a notice of appearance on its behalf within 30 days [Doc. 74]. Due to Pollak's failure to comply with this order, the Clerk of Court entered default as to Pollak [*See* Docs. 86, 87]. On August 18, 2025, the Court granted plaintiffs' Motion to Cancel Trial and ordered plaintiffs to file a motion for default judgment within 60 days [Doc. 89]. Now pending before the Court are plaintiffs' motions for default judgment as to the Viviant Entities and Pollak [Docs. 90, 92, 93, 94].

## II.     Analysis

Federal Rule of Civil Procedure 55 "contemplates a two-step process for obtaining a default judgment against a defendant who has failed to plead or otherwise defend." *Banner Life Ins. Co. v. Columbia State Bank*, No. 3:19-CV-116, 2020 WL 3977635, at *1 (E.D. Tenn. July 14, 2020). "First, pursuant to Rule 55(a), a plaintiff must request from the Clerk of Court an entry of default, describing the particulars of the defendant's failure to plead or otherwise defend." *Id.* If the clerk enters default, "the plaintiff must then move the Court for entry of default judgment pursuant to Rule 55(b)." *Id.* Pursuant to Rule 55(b), a default can be entered by the Clerk "[i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by computation[.]" Fed. R. Civ. P. 55(b)(1). But "[i]n

7

all other cases, the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2).

Proceeding under Rule 55(b)(2), after the Clerk has entered default, the court must take the complaint's factual allegations as true. *Bogard*, 2013 WL 2209154, at *3. However, the Court must determine whether the factual allegations "are sufficient to state a claim for relief as to each cause of action for which the plaintiff seeks default judgment." *J & J Sports Prods., Inc. v. Rodriguez*, No. 1:08-CV-1350, 2008 WL 5083149, at *1 (N.D. Ohio Nov. 25, 2008) (citation omitted). Although the Court takes factual allegations regarding liability as true, the plaintiff must prove the amount of damages. *Bogard*, 2013 WL 2209154, at *3.

### A. Sufficiency of the Complaint

#### 1. Joint Employment

As an initial matter, "[t]o establish [a] claim under Title VII, [plaintiffs] must show that [defendants were their] 'employer' within the meaning of the statute." *Nethery v. Quality Care Inves., L.P.*, 814 F. App'x 97, 102 (6th Cir. 2020). Here, plaintiffs argue that defendants jointly employed them, resulting in shared liability for their discriminatory and retaliatory conduct [Doc. 90, p. 7]. "Under the 'joint-employer' theory, 'an entity that is not the plaintiff's formal employer may be treated under these doctrines as if it were the employer for purposes of employment laws such as Title VII.'" *Id.* at 102–03 (quoting *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011)). "One entity is the joint employer of another entity's formal employees, and thus liable

under federal and state anti-discrimination laws, if the two 'share or co-determine those matters governing essential terms and conditions of employment.'" *Sanford*, 449 F. App'x at 492 (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985)).

In determining whether an entity is a joint employer, courts consider facts such as "the ability to hire, fire, and discipline, affect compensation and benefits, and direct and supervise performance." *Id.* *See NLRB v. Centra, Inc.*, 954 F.2d 366, 370 n.2 (6th Cir. 1992) (identifying factors including "supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, [and] issuance of operating instructions") (quoting *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir. 1988)).

Here, the Court finds that the amended complaint contains sufficient facts to establish that defendants jointly employed plaintiffs. For instance, after Pollak contracted with the Viviant Entities to provide services at the Facility, Dixon, Laws, and Laws-Hord, who initially were employed by the Viviant Entities, were required to submit new-hire applications to Pollak [Doc. 16 ¶ 21]. Pollak then offered Dixon, Laws, and Laws-Hord employment in their original positions, at the same or reduced hourly payrates [*Id.* ¶¶ 21, 73]. Pollak reduced Laws-Hord's pay by $2 per hour [*Id.* ¶ 23]. These circumstances give rise to an inference that Pollak had "the ability to hire, fire, and discipline, [and] affect compensation and benefits" of plaintiffs. *See Sanford*, 449 F. App'x at 492.

Moreover, upon hiring Dixon, Laws, and Laws-Hord, Pollak established new payroll practices and time clock procedures and gave them new identification badges [*Id.*].

9

These plaintiffs continued to work at the Facility using the Viviant Entities' and Pollak's shared equipment and supplies to perform their work, and both the Viviant Entities and Pollak exercised control over plaintiffs' work [*Id.*]. Likewise, in *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, the court found evidence that the defendant entity jointly employed the plaintiffs, in part because the defendant directly supervised the plaintiffs, tracked their tasks using electronic keycards, and required them to log their time through the defendant's electronic timekeeping system. 513 F. Supp. 3d 761, 786 (E.D. Mich. 2021).

The amended complaint also shows that defendants jointly directed and supervised plaintiffs' performance. Specifically, the fact that Dixon complained to Lewis-Taylor about discrimination and retaliation while Lewis-Taylor was employed by Pollak indicates that Pollak acted in a supervisory capacity over her. *See EEOC v. Skanska USA Bldg., Inc.*, No. 2:10-CV-2717, 2011 WL 13103437, at *3 (W.D. Tenn. Sept. 20, 2011) (finding the existence of a joint employer relationship where the plaintiff voiced concerns regarding racial harassment to a supervisor employed by defendant). Likewise, after Lewis-Taylor was hired by Pollak, she promised Dixon, Laws, and Laws-Hord that Pollak would honor sign-on, referral, and work bonuses that the Viviant Entities had promised them [*Id.* ¶¶ 50, 73]. These facts give rise to an inference that Pollak had power to affect plaintiffs' compensation and benefits.

As for plaintiffs Jones and Lee, who were employed before Pollak contracted with the Viviant Entities, the amended complaint alleges that the Viviant Entities drafted policies and procedures affecting their employment and required Pollak to implement and

10

adopt them [*Id.* ¶ 22]. These facts show that Pollak at least indirectly supervised the daily activities of Dixon, Laws, and Laws-Hord [*Id.*]. *See NLRB*, 954 F.2d at 371 n.2 (quoting *W.W. Grainger, Inc.*, 860 F.2d at 247).

Further, Jones and Lee worked under management personnel from both entities, including Shirley and Ingram, who provided training materials to plaintiffs, maintained their works schedules, and closely supervised operations at the Facility [*Id.* ¶¶ 22–23]. Taken together, the circumstances indicate that Pollak and the Viviant Entities shared or co-determined at least some matters governing the terms and conditions of plaintiffs' employment. *See Sanford*, 449 F. App'x at 492. Accordingly, the Court finds that plaintiffs have set forth sufficient facts to demonstrate that defendants jointly employed plaintiffs.

### 2. Hostile Work Environment

Plaintiffs also allege that defendants created, maintained, and failed to remedy a race-based hostile work environment that made it more difficult for plaintiffs to perform their jobs [Doc. 16 ¶¶ 35–38]. "Title VII prohibits racial harassment that creates a hostile or abusive work environment." *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). To establish a hostile work environment claim based on race discrimination, "a plaintiff must show: 1) that [s]he is a member of a protected class; 2) that [s]he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with h[er] work performance by creating an intimidating, hostile, or offensive work environment; and

11

5) the existence of employer liability." *Id.* To determine if there is a hostile work environment, courts look at the totality of the circumstances. *Id.*

"[A]n employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." *Jackson v. Quanex Corp.*, 191 F.3d 647, 668 (6th Cir. 1999). In this regard, the Sixth Circuit has instructed courts to "aggregate hostile work environment claims, [and to] consider[] even those claims that were not directed at a particular plaintiff and those claims that a particular plaintiff did not witness." *Berryman v. Supervalu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012) (citing *Jackson*, 191 F.3d at 661).

First, the amended complaint states that Jones, Laws, Laws-Hord and Lee are members of a protected class because they are African American [Doc. 16 ¶ 26]. *See Jackson*, 191 F.3d at 668 (finding that an African American plaintiff was the victim of a racially hostile work environment). Dixon, who is white, is also a member of a protected class based on her advocacy on behalf of other protected class members, including Laws [*Id.* ¶¶ 26, 37, 82–87]. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009) (noting that "[i]ndividuals are also protected under Title VII from discrimination because of their advocacy on behalf of protected class members"); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573–78 (6th Cir. 2000) (where the plaintiff stated a claim under Title VII by alleging that he faced discrimination based on his advocacy on behalf of female and minority employees). Thus, the first element is met.

12

The amended complaint further alleges that plaintiffs were subjected to unwelcome harassment based on race, satisfying the second and third elements. The Sixth Circuit has determined that a plaintiff may satisfy these elements "by adducing evidence of the use of race-specific and derogatory terms, or comparative evidence of how the alleged harassers treated members of both races in a mixed-race workplace." *Smith v. P.A.M. Transport, Inc.*, 154 F.4th 375, 383 (6th Cir. 2025).

Here, plaintiffs allege that Shirley, Ingram, and Lewis-Taylor continuously used derogatory race-based language in reference to African American employees in the workplace [*Id.* ¶¶ 36, 40, 45–46]. Moreover, plaintiffs allege that Shirley called the African American plaintiffs "ghetto" and often referred to them collectively as "them people" [*Id.* ¶ 41]. Shirley openly socialized with white employees and not with African American employees, who she routinely targeted and scolded over minor issues [*Id.* ¶ 42]. These facts raise an inference that defendants treated African American employees less favorably than other employees.

Fourth, plaintiffs allege that the harassment unreasonably interfered with their work performance. To satisfy this element, plaintiffs must show that "the race-based harassment they experienced was 'sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment.'" *Smith*, 154 F.4th at 391 (quoting *Strickland v. City of Detroit*, 995 F.3d 495, 505 (6th Cir. 2021)). The Sixth Circuit has found that "even a single incident of racial harassment, including the use of an egregious racial slur like the n-word, 'may be so severe as to constitute a hostile work

environment.'" *Id.* at 392 (citation omitted); *Ennis v. Tennessee*, 835 F. App'x 811, 820 (6th Cir. 2020) (noting that "an isolated act of discrimination can create a hostile work environment" if it is "extremely serious"); *Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1253–54 (11th Cir. 2014) (finding that a hostile work environment existed where an employee carved a racial slur into the wall of the workplace); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (determining that defendant maintained a racially hostile work environment where a supervisor used an "offensive racial epithet" while yelling at a subordinate). In particular, "the n-word . . . is odious and degrading and humiliating in the extreme when used as an insult against African Americans." *Smith*, 154 F. 4th at 392 (internal quotation marks and citation omitted). Therefore, "the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance." *Johnson v. United Parcel Serv.*, 117 F. App'x 444, 454 (6th Cir. 2004).

Given plaintiffs' allegations that defendants' supervisors repeatedly and frequently used racial slurs and other derogatory language in reference to African American plaintiffs in the workplace, plaintiffs have shown that the race-based harassment they faced was severe [*Id.* ¶¶ 40–46]. This conclusion is further supported by the fact that Shirley and Lewis-Taylor had supervisory authority over plaintiffs' employment and directed offensive comments towards plaintiffs [*Id.* ¶¶ 21, 23, 33, 46, 73]. In fact, "[t]he utterance of a slur by a manager greatly increase[s] its severity, and harassment will be more severe if offensive comments were directed at a plaintiff." *Smith*, 154 F.4th at 392 (internal quotation marks and citation omitted); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S.

14

742, 763 (1998) (noting that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character"); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (stating that "a supervisor's use of the [n-word] impacts the work environment far more severely than use by co-equals"). Thus, the Court finds that this conduct alone is "extremely serious" such as to indicate that defendants created and maintained a hostile work environment.

Lastly, the amended complaint sets forth sufficient facts to show the existence of employer liability. Specifically, plaintiffs allege that Shirley, Ingram, and Lewis-Taylor engaged in race-based discriminatory and retaliatory conduct toward plaintiffs, resulting in their discharge or constructive termination [*Id.* ¶¶ 36–37, 40–42, 46, 68]. Furthermore, plaintiffs assert that Shirley, Lewis-Taylor, and Ingram made, influenced, and/or were involved in the decision to terminate plaintiffs' employment [*Id.* ¶ 80]. Considering the totality of the circumstances, the Court finds that plaintiffs have set forth sufficient facts to establish a hostile work environment claim against defendants.

### 3. Racial Discrimination

In addition, plaintiffs allege that defendants discriminated against them in the terms, conditions, and privileges of their employment and subjected them to disparate treatment because of their race, and with respect to Dixon, because of her association with and advocacy on behalf of Laws and other plaintiffs, in violation of 42 U.S.C. § 1981, the THRA, and Title VII [Doc. 16 ¶¶ 88–103]. "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). "A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson*, 215 F.3d at 572.

"Racial slurs or statements that suggest that the decision-maker relied on . . . stereotypes to assess an employee's ability to perform can constitute direct evidence." *Erwin v. Potter*, 79 F. App'x 893, 897 (6th Cir. 2003) (citing *Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, No. 01-2690, 2003 WL 21774017, at *8 (6th Cir. July 30, 2003)) (finding that a decision-maker's statements referring to an employee's protected status may constitute direct evidence of discrimination). However, "isolated and ambiguous" comments do not establish employer liability. *Id.* at 898. "Thus, courts often look for a 'temporal proximity between the discriminatory act and the termination.'" *Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 878 (M.D. Tenn. 2021) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004)).

In this case, plaintiffs have presented direct evidence of discrimination by alleging that their supervisors, Shirley and Lewis-Taylor, repeatedly used racial slurs in the workplace [Doc. 16 ¶¶ 40–46]. Plaintiffs also allege that Ingram referred to a new employee as a "little Black girl" and frequently made racist comments [*Id.* ¶ 45]. Moreover, plaintiffs allege that Shirley, Ingram, and Lewis-Taylor were involved in the

16

decision to terminate plaintiffs' employment shortly after they raised complaints about racial discrimination [*Id.* ¶¶ 36–37, 40–42, 46, 68, 80]. Thus, the combination of plaintiffs' termination and the frequent and severe racial slurs used by defendants' management constitutes direct evidence of racial discrimination.

Plaintiffs have also presented circumstantial evidence of racial discrimination. "Under the circumstantial evidence approach, . . . a plaintiff must show that 1) [s]he is a member of a protected class; 2) [s]he was qualified for h[er] job and performed it satisfactorily; 3) despite h[er] qualifications and performance, [s]he suffered an adverse employment action; and 4) that [s]he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside h[er] protected class." *Johnson*, 215 F.3d at 572–73.

As explained above, plaintiffs are all members of protected classes. *See infra* Section III.A.2. Plaintiffs also allege that they were qualified for their jobs and performed them in a competent and satisfactory manner [Doc. 16 ¶ 34]. Further, the amended complaint demonstrates that all plaintiffs suffered adverse employment actions. For instance, Jones, Lee, Laws, and Laws-Hord were denied pay and referral bonuses, favorable work schedules, office space, and/or received unequal pay compared to similarly situated, non-African American employees [*Id.* ¶ 39]. Jones, a registered nurse with 30 years of experience, was given an office with a picnic table instead of a desk and paid less than non-African American licensed nurse practitioners [*Id.* ¶¶ 47–48]. Jones was

17

terminated shortly after she complained about discriminatory pay and refused to lie to state investigators [*Id.* ¶ 67].

Additionally, Lewis-Taylor gave Dixon more favorable scheduling than Laws who had more seniority [*Id.* ¶ 49]. And Laws did not receive the same $150 bonus payment earned by Dixon although they performed the same tasks [*Id.* ¶¶ 50–51]. Laws was terminated shortly after she submitted a written complaint [*Id.* ¶ 76]. Likewise, Laws-Hord was terminated shortly after she submitted written complaints about discrimination and refused to obstruct the investigation of the Facility [*Id.* ¶¶ 66, 75]. Plaintiffs also allege that Dixon experienced constant harassment, badgering, and interference with her job, including nitpicking her while performing her job duties and ignoring her when she made work-related inquiries, which led to her constructive discharge [*Id.* ¶¶ 83–87].

Taken together, these circumstances suggest that defendants discriminated against plaintiffs with respect to their compensation, terms, conditions, or privileges of employment because of their race and with respect to Dixon, because of her association with and advocacy on behalf of other plaintiffs. Accordingly, plaintiffs have sufficiently stated a claim for racial discrimination.

### 4. Retaliation

Plaintiffs further allege that defendants retaliated against them by terminating and constructively discharging them for opposing, reporting, and complaining about racial discrimination, harassment, and retaliation [Doc. 16 ¶¶ 60–61, 63, 66–67, 70–71, 75]. To establish a claim for retaliation under Title VII, a plaintiff must demonstrate that: "(1) she

engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor*; and (4) there was a causal connection between the protected activity and the adverse employment action *or harassment*." *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis in original).

First, the amended complaint states that plaintiffs complained of racial discrimination and harassment to defendants [*Id.* ¶ 59]. Plaintiffs allege that defendants did not remedy the discrimination or harassment, allowed it to persist, and ultimately terminated plaintiffs [*Id.* ¶¶ 58–60]. Laws confronted Shirley about her discriminatory conduct and submitted a written complaint about discriminatory pay [*Id.* ¶¶ 43, 66]. Lee and Jones also complained about/reported discriminatory pay practices [*Id.* ¶¶ 61, 64]. Likewise, Dixon complained about the association discrimination, harassment, and retaliation she faced [*Id.* ¶¶ 86–87].

Second, plaintiffs allege that defendants had knowledge of their protected activities through their complaints to management personnel [*Id.* ¶¶ 43, 54, 66, 71].

Third, defendants thereafter took adverse employment action by terminating the employment of Lee, Jones, Laws-Hord, and Laws, and constructively discharging Dixon [*Id.* ¶¶ 61, 67, 75–76, 87].

Lastly, plaintiffs demonstrate a causal connection by alleging that the termination and constructive discharge occurred shortly after their protected activities. *See Miller v.*

19

*Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986) ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge.").

In *Singfield v. Akron Metropolitan Housing Authority*, the plaintiff was terminated three months after he filed a discrimination charge with the Equal Employment Opportunity Commission. 389 F.3d 555, 563 (6th Cir. 2004). There, the Sixth Circuit found that the temporal proximity between the plaintiff's termination and charge established a causal connection to establish a prima facie case of retaliation. *Id.* Here, the amended complaint here alleges that each plaintiff was terminated or constructively discharged within only days of her protected activity, showing a stronger causal link than in *Singfield* [*Id.* ¶¶ 61, 63, 66–67, 70–71, 75]. Ultimately, the derogatory language used by management combined with the close temporal proximity between plaintiffs' protected activities and termination/constructive discharge establish causation. Accordingly, the Court finds that plaintiffs have sufficiently alleged a retaliation claim against defendants.

### 5. Constructive Discharge

Dixon alleges that she was constructively discharged due to the discrimination, harassment, and retaliation that she experienced because of her association with and advocacy on behalf of Laws and other plaintiffs [Doc. 16 ¶ 87]. A constructive discharge claim has two elements. *Green v. Brennan*, 578 U.S. 547, 555 (2016). First, "[a] plaintiff must . . . prove that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign." *Id.* Second, a

20

plaintiff must "show that [s]he actually resigned." *Id.* (citing *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004)).

Here, the amended complaint alleges that Shirley, Taylor-Lewis, and Ingram knew about Dixon's familial relation and association with Laws, her advocacy on behalf of Laws and other plaintiffs, and her opposition to defendants' discriminatory conduct [Doc. 16 ¶ 82]. Dixon alleges that defendants harassed, targeted, and retaliated against her as a result, in part by nitpicking her while she performed her job duties and ignoring her when she made work-related inquiries [*Id.* ¶ 84]. Defendants' conduct adversely impacted Dixon's ability to perform her job [*Id.*]. Dixon complained to Lewis-Taylor that she was being targeted because of her association with and advocacy on behalf of Laws and Laws-Hord [*Id.* ¶ 86]. Eventually, Ingram stated that defendants' management wanted to "figure out a way to get rid of" Dixon because she was "snitching" about defendants' discriminatory and retaliatory conduct [*Id.* ¶ 85].

These circumstances show that defendants subjected plaintiff Dixon to "badgering, harassment, or humiliation" intended to encourage her resignation. *See Jordan*, 539 F. Supp. 3d at 884–85 (noting that "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation" supports a finding of constructive discharge). Therefore, Dixon has shown that defendants discriminated against her to the point where a reasonable person would have felt compelled to resign, and she ultimately did resign [*Id.* ¶ 87]. *See Green*, 578 U.S. at 555 (citing *Penn. State Police*, 542 U.S. at

21

141). Accordingly, the Court finds that Dixon has sufficiently alleged a constructive discharge claim against defendants.

### 6. Retaliatory Discharge

Jones and Laws-Hord also bring retaliatory discharge claims under the TPPA and Tennessee common law as alternate theories of liability [Doc. 16 ¶¶ 104–11]. Under the TPPA, "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). To establish a claim for retaliatory discharge under the TPPA, a plaintiff must show: "(1) [t]he plaintiff was an employee of the defendant; (2) [t]he plaintiff refused to participate in or remain silent about illegal activity; (3) [t]he defendant employer discharged or terminated the plaintiff's employment; and (4) [t]he defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity." *Sourinho v. Rich Prods. Corp.*, No. 21-5289, 2021 WL 4735844, at *3 (6th Cir. Oct. 12, 2021) (citation omitted) (emphasis in original).

Under the common law, a plaintiff must show "that retaliation for the protected conduct was a 'substantial factor' in the termination of his employment[]" whereas under the TPPA, a plaintiff must show that "retaliation for the protected conduct was the *sole* reason." *Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (emphasis in original); *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 28 (Tenn. 2011) ("[T]he legislature has chosen to enact a stringent standard and set the bar high for recovery under a retaliatory discharge claim pursuant to the [TPPA].").

22

Here, the amended complaint alleges that Laws-Hord and Jones were employees of defendants [*Id.* ¶¶ 28, 31]. Further, plaintiffs allege that Shirley instructed them to lie to state officials regarding the state's investigation about a resident's death, missing narcotics, and the reason why safety mats were not used at the Facility [*Id.* ¶ 62]. Jones and Laws-Hord "refused to remain silent about or participate in illegal activity, disclosed what they believed to be violations of state law, and truthfully answered the state surveyor's questions regarding the same" [*Id.* ¶ 64]. Soon after speaking with the state investigator and disclosing state law violations, defendants terminated Jones and Laws-Hord [*Id.* ¶¶ 64, 67, 75].

However, viewing the amended complaint in the light most favorable to Laws-Hord and Jones, it does not appear that the sole reason for their termination was their refusal to remain silent about or participate in illegal activities. Rather, the amended complaint alleges that Jones was terminated "because of her race, her opposition to and reports of race discrimination, and in retaliation for reporting violations of state law and/or for refusing to remain silent about or participate in illegal activity" [*Id.* ¶ 67]. Moreover, Laws-Hord was terminated "for alleged insubordination and violation of company policy" after she submitted a written complaint about Lewis-Taylor and Shirley regarding racially discriminatory pay practices and other issues [*Id.* ¶¶ 66, 75].

Since other factors, such as written complaints about racial discrimination, allegedly played a role in the termination of Laws-Hord and Jones, the Court does not find that they have met the high bar for recovery under the TPPA. *See Sykes*, 343 S.W.3d at 28.

23

However, the amended complaint suggests that Jones and Laws-Hord's refusal to remain silent about or participate in illegal activities was at least a "substantial factor" in their termination. *See Williams*, 465 S.W.3d at 110. Accordingly, the Court finds that Jones and Laws-Hord have sufficiently stated a common law claim for retaliatory discharge.

### B. Damages

Turning to the appropriate remedy, plaintiff seeks back pay, compensatory damages, punitive damages, pre- and post-judgment interest, and attorneys' fees and costs. Although the Court must take as true the factual allegations regarding liability in the complaint, plaintiff must prove the appropriate amount of damages. *Bogard*, 2013 WL 2209154, at *3. In determining damages, "[t]he Court may rely on affidavits [and other materials] . . . without the need for a hearing." *Dirs. of the Ohio Conf. of Plasterers & Cement Masons Combined Funds, Inc. v. Akron Insulation & Supply, Inc.*, No. 5:16-CV-1674, 2018 WL 2129613, at *5 (N.D. Ohio May 8, 2018).

### 1. Back Pay

As to back pay, plaintiffs filed declarations demonstrating that their total back pay damages amount to $281,384. In particular, Jones filed a declaration stating that she would have received $294,384 from late June 2022 through the present if she remained employed by defendants [Doc. 90-2 ¶ 12]. Jones states that she earned approximately $180,000 from other jobs during that same period and thus, her lost wages total $114,384 [*Id.*]. Further, Lee's declaration states that she suffered an economic loss of $64,000 due to her wrongful discharge [Doc. 90-3 ¶ 10].

24

Laws also filed a declaration asserting that she would have earned approximately $76,800 from July 2022 through the present if she remained employed by defendants [Doc. 90-4 ¶ 13]. Laws submits that she earned approximately $40,500 during that same period for other jobs and thus, her lost wages are approximately $36,300 [*Id.*]. Laws-Hord filed a declaration stating that she would have earned approximately $90,500 from July 2022 through the present if she remained employed by defendants [Doc. 90-5 ¶ 12]. She states that he earned approximately $81,800 from other jobs during that same period and thus, her lost wages are approximately $8,700 [*Id.*].

Lastly, Dixon's declaration states that she would have earned approximately $75,000 from the time of her separation through the present if she remained employed by defendants [Doc. 90-6 ¶ 12]. She states that she earned approximately $17,000 from other jobs during that period and thus, her lost wages total $58,000 [*Id.*]. In addition, plaintiffs filed a damages chart demonstrating that they incurred back pay damages totaling $281,384 [Doc. 90-7]. Based on plaintiffs' declarations, the Court finds that plaintiffs are entitled to an award of lost wages in the amount of $281,384.

### 2. Compensatory Damages

Plaintiffs further request $50,000 each in compensatory damages for emotional distress and anxiety [Doc. 90, p. 19]. Emotional distress damages are recoverable under Title VII, 42 U.S.C. § 1981, and the THRA. *See* 42 U.S.C. § 1981a(b)(3); *Turic v. Holland Hosp.*, 85 F.3d 1211, 1215 (6th Cir. 1996); Tenn. Code Ann. 4-21-306(a)(7). "A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the

25

plaintiff's burden" to show that a defendant's unlawful actions caused his or her emotional distress. *Turic*, 85 F.3d at 1215.

Here, plaintiffs' declarations demonstrate that defendants' conduct caused them emotional distress and anxiety. For instance, Jones, Laws, Laws-Hord, and Dixon state that the discrimination, harassment, retaliation, and wrongful termination they experienced working for defendants has caused ongoing emotional pain and suffering, affecting their personal relationships and daily life activities [Doc. 90-2 ¶ 13; Doc. 90-4 ¶ 14; Doc. 90-5 ¶ 13; Doc. 90-6 ¶ 13]. Their declarations state that they also suffered emotional distress, depression, constant tension, and anxiety because of defendants' conduct [*Id.*]. Jones, Laws-Hord, and Dixon share that these experiences have made it difficult for them to trust future employers and/or co-workers [Doc. 90-2 ¶ 13; Doc. 90-5 ¶ 13; Doc. 90-6 ¶ 13]. Likewise, Lee's declaration states that she has faced ongoing emotional pain and suffering and exacerbated medical conditions due to the discrimination, harassment, retaliation, and wrongful termination perpetrated by defendants [Doc. 90-3 ¶ 11]. Lee also shares that she has suffered from depression, anxiety, headaches, constant worrying, insomnia, moodiness, and agitation due to defendants' conduct [*Id.*].

Based on plaintiffs' declarations and the egregiousness of defendants' conduct in this case, including the repeated use of racial slurs by supervisors at the Facility, the Court finds that plaintiffs have presented evidence to establish that they are entitled to compensatory damages. *See Perry v. Oregon Healthcare, LLC*, No. 3:22-CV-1512, 2023 WL 423249, at *5 (N.D. Ohio Jan. 26, 2023) (awarding compensatory damages to a

26

plaintiff who suffered from "increased anxiety, loss of sleep, restlessness, extreme stress, and lack of trust for future employers" due to the defendant's conduct). Therefore, the Court will award each plaintiff $50,000 in compensatory damages for emotional distress and anxiety, for a total award of $250,000.

### 3. Punitive Damages

Plaintiffs also request $50,000 each in punitive damages based on defendants' racially discriminatory conduct [Doc. 90, p. 19]. They contend that the racial harassment at the Facility was severe and pervasive, and the clear pattern of retaliatory harassment and discharges shows defendants' malice and reckless indifference to plaintiffs' federally protected rights [*Id.*].

"Ordinarily, the Court may award punitive damages as part of a default judgment." *Scrivo v. Kendrick-Hall*, No. 2:18-CV-13702, 2020 WL 6335991, at *4 (E.D. Mich. Oct. 29, 2020) (citing *Davis v. Brown*, 23 F. App'x 504, 506 (6th Cir. 2001)). "Punitive damages are available in a Title VII claim where the plaintiff can demonstrate by a preponderance of the evidence that the employer 'engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) (quoting 42 U.S.C. § 1981a(b)(1)). Punitive damages are available in cases involving intentional discrimination. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). In other words, to be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law[.]" *Id.* at 536.

The amended complaint alleges that defendants were aware of the racial discrimination and harassment taking place at the Facility, and their supervisors actively perpetuated it [Doc. 16 ¶¶ 40–46, 78]. Despite plaintiffs' verbal and written complaints of racial discrimination and harassment to defendants' management, defendants allowed the harassment and retaliation to continue and did not address it [*Id.* ¶¶ 58–60]. Thus, defendants' conduct demonstrates at least a reckless indifference to plaintiffs' federally protected rights. Accordingly, the Court will award each plaintiff $50,000 in punitive damages, for a total award of $250,000.

### 4. Pre- and Post-Judgment Interest

Plaintiffs also request pre-judgment interest on their backpay and emotional distress damages [Doc. 90, pp. 19–20]. In support, plaintiffs state that they have been deprived of back pay and emotional distress damages for more than over three years, during which they have struggled financially [*Id.* at 20]. They contend that the pre-judgment interest rate applied under 28 U.S.C. § 1961 is fair considering the remedial goal of making plaintiffs whole, the high rates of inflation in recent years, and the fact that no party would be unjustly enriched or penalized if plaintiffs' pre-judgment interest was calculated using this interest rate [*Id.* at 21]. They also submit that annual compounding is appropriate, and they request that the Court apply the same pre- and post-judgment interest rate [*Id.* at 21–22].

"Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers." *Benton v. BlueCross BlueShield of Tenn., Inc.*, 765 F. Supp. 3d 723, 740 (E.D. Tenn. 2025) (quoting *Loeffler v. Frank*, 486 U.S. 549, 557 (1988)). To

that end, "it is ordinarily an abuse of discretion not to include pre-judgment interest in a back-pay award." *Id.* (quoting *EEOC. v. Ky. State Police Dep't*, 80 F.3d 1086, 1098 (6th Cir. 1996)). "To calculate prejudgment interest, courts often apply the statutory postjudgment framework set forth in 28 U.S.C. § 1961." *Id.* Under 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961. "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." *Id.* In applying this rate, courts examine factors, such as "the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation." *Benton*, 765 F. Supp. 3d at 740 (internal quotation marks and citation omitted).

Here, the Court finds that an award of prejudgment interest is appropriate when considering the remedial goal of making plaintiffs whole for the discrimination and harassment they faced, the high rates of inflation in recent years, and the fact that it appears no party would be unjustly enriched or penalized if plaintiffs' prejudgment interest was calculated using 28 U.S.C. § 1961. *See Benton*, 765 F. Supp. 3d at 740.

Additionally, plaintiffs are entitled to prejudgment interest starting from the dates of their termination until the dates of the Court's judgment in their favor, and the Court finds it appropriate to compound plaintiffs' prejudgment interest annually as they request.

29

*See Lankford v. Reladyne, LLC*, No. 1:14-CV-682, 2016 WL 3640691, at *9 (S.D. Ohio June 29, 2016); *Bell v. Prefix, Inc.*, No. 05-74311, 2010 WL 2089323, at *5 (E.D. Mich. May 24, 2010). Specifically, the termination dates for plaintiffs are as follows:

| Plaintiff | Date of Termination/Discharge |
|---|---|
| Plaintiff Lee | June 7, 2022 |
| Plaintiff Jones | June 28, 2022 |
| Plaintiffs Laws and Laws-Hord | July 20, 2022 |
| Plaintiff Dixon | August 12, 2022 |

[Doc. 90-2 ¶ 7; Doc. 90-3 ¶ 6; Doc. 90-4 ¶ 7; Doc. 90-5 ¶ 7; Doc. 90-6 ¶ 7].

Turning to post-judgment interest, the Sixth Circuit has stated that "the statutory postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards." *See Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 735 (6th Cir. 2017). Accordingly, the Court finds that plaintiffs are also entitled to post-judgment interest at a rate set by 28 U.S.C. § 1961.

### 5. Attorneys' Fees and Costs

Plaintiffs request $122,485 in attorneys' fees based on hourly rates of $500 for attorney Douglas B. Janney III and $350 for attorney Curt M. Masker [Doc. 90, pp. 22–25]. In support, plaintiffs submit that Janney has 27 years of employment litigation experience and was approved at $400 per hour in this district in January 2020 [*Id.* at 23]. Plaintiffs also note that Masker has practiced law since 2017, and his practice has been focused exclusively on employment litigation in Tennessee since September 2019 [*Id.*]. Plaintiffs

30

substantiate their request with Janney and Masker's affidavits, in which they outline their education, credentials, and professional experience [*See* Docs. 90-8, 90-10]. Further, Janney and Masker represent that they have performed extensive work on this case without compensation for more than three years, including drafting two lengthy complaints, responding to two motions to dismiss, completing extensive written discovery and motion practice, participating in mediation, and preparing their default judgment motions [Doc. 90, pp. 23–24]. Additionally, counsel for plaintiffs attach time records demonstrating that Janney is owed $48,250 in attorneys' fees based on 96.5 hours of work, and Masker is owed $74,235 in attorneys' fees based on 212.1 hours of work [Doc. 90-8, pp. 8–19; Doc. 90-10, pp. 5–21].

In determining whether the requested amount of attorneys' fees is reasonable, courts often employ the "lodestar method" which is "the proven number of hours reasonably expended on the case by an attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). Twelve factors are considered in determining the reasonableness of hours and the rate:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circutances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."

*Id.* at 415–16 (quoting *Reed v. Rhodes*, 179 F.3d 453, 471–72 n.3 (6th Cir. 1999)).

31

However, "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. *Id.* at 416 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)) (internal quotation marks omitted). In determining the appropriate hourly rate to apply, courts "must consider the prevailing market rate in the relevant community for the same type of work at issue." *Brooks v. Invista*, No. 1:05-CV-328, 2008 WL 304893, at *3 (E.D. Tenn. Jan. 30, 2008) (citations omitted). For fee purposes, the "relevant community" is the "legal community within the court's territorial jurisdiction or venue." *Id.* (citations omitted). The "prevailing market rate" is "that rate which lawyers of comparable skill and experience can reasonably expect to command within the relevant community." *Id.* (citations omitted).

Based on the professional experience, skill, and education of Janney and Masker as outlined in their declarations [Docs. 90-8, 90-10], the Court finds that the requested attorneys' fees are reasonable. Specifically, Janney's declaration states that he has practiced employment litigation in Tennessee for 27 years, he has been an active member of the National Employment Lawyers Association since 2003, and he has received several awards for his work in employment litigation [Doc. 90-8, pp. 1–2]. Masker's declaration notes that he received his J.D. from Vanderbilt University in 2017, and he has been licensed to practice law in Tennessee since 2019 [Doc. 90-10, p. 1]. Masker also notes that he has practiced employment litigation since September 2019, he is a member of the National Employment Lawyers Association, and he has received several awards for his work in employment litigation [*Id.* at 2]. Given the experience, reputation, and ability of the

32

attorneys involved in this matter, the Court finds that the requested attorneys' fees are reasonable.

Moreover, the Court finds that the hourly rates requested are reasonable and consistent with the prevailing market for highly experienced counsel. This determination is supported by the Knoxville Bar Association's 2023 Economic & Law Practice Management Survey, which found that 18% of Knoxville attorneys have average hourly rates of $301-$350 and 20% have average hourly rates over $350. *See* KNOXVILLE BAR ASSOCIATION, ECONOMICS & LAW PRACTICE MANAGEMENT SURVEY 43 (2023), available at https://www.knoxbar.org/?pg=EconomicSurvey2023.

Additionally, Janney's uncontested declaration confirms that his requested hourly rate of $500 is significantly less than his typical hourly rate of $650 to $750 and rates prevailing in Nashville where he practices most of the time [Doc. 90-8, pp. 3–4]. Given his skills and extensive experience in employment litigation, Janney's requested rate of $500 per hour appears to appropriately reflect his expertise. *See Benton*, 765 F. Supp. 3d at 739 (finding that $450 per hour was a reasonable hourly rate for an experienced East Tennessee employment attorney). Since defendants have not objected to the requested rates or to the total amount requested, the Court finds that the requested fees are reasonable.

The Court also finds that the time and labor involved in this matter was significant, as shown by Janney and Masker's declarations and a review of the record. Specifically, the record shows that Pollak actively litigated this case for several years by filing multiple motions to dismiss and opposing plaintiffs' efforts to obtain entries of default against the

33

defendants before Pollak's counsel withdrew from the case [*See* Docs. 11, 26, 36, 37, 38, 40, 55, 56, 58]. Furthermore, Janney and Masker represent that the parties engaged in extensive written discovery and participated in mediation, demonstrating that this matter involved substantially more work than a default judgment case in which a defendant simply fails to answer or appear [Doc. 90-8, p. 6; Doc. 90-10, p. 3]. The Court also acknowledges that plaintiffs "have been paid nothing for the considerable amount of time that [they] have put into the case, which impacted [their] ability to accept representation in and litigate other cases" [Doc. 90-8, p. 6]. Thus, the requested attorneys' fees are reasonable considering the time and labor required in this matter.

Lastly, the services provided by Masker and Janney helped plaintiffs obtain favorable rulings from the Court, including the Clerk's entry of default judgment against three defendants [*See* Docs. 60, 61, 87]. Accordingly, the Court will award plaintiffs $122,485.00 in attorneys' fees.

## III. Conclusion

For the foregoing reasons, the Court finds that plaintiff is entitled to a default judgment against defendants. Accordingly, Count 3 of the amended complaint is **DISMISSED** without prejudice, and plaintiffs' motions for default judgment [Docs. 90, 92, 93, 94] will be **GRANTED.** The Court will **ORDER** that plaintiffs recover the following from defendants the following:

- Lost wages in the amount of $281,384.00;

- Compensatory damages in the amount of $250,000.00 ($50,000 per plaintiff);

- Punitive damages in the amount of $250,000.00 ($50,000 per plaintiff);

- Pre-judgment and post-judgment interest according to 28 U.S.C. § 1961; and

- Attorneys' fees in the amount of $122,485.00.

The Clerk of Court will be **DIRECTED** to **CLOSE** this case. A separate order will enter.

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

35